May it please the Court, Your Honors, E.M. Berg here with my colleague Takao Keller on behalf of the St. Louis Police Retirement System. I'd like to reserve four minutes of my time. Thank you. This case is about the placement of Da Vinci Surgical Systems and particularly the impact of the economic crisis that occurred in 2007 and 2008. Defendants repeatedly assured investors that the crisis wasn't having any impact at all on the company. And the first of these many assurances was at the beginning of the class period on January 31, 2008, when an analyst asked, are you seeing any sort of slowdown pressure in terms of the overall credit crunch, anything affecting finance of systems? Defendant Smith, who is the Chairman and CEO of the company, said the answer is no. He said that Defendant McNamara, who is the Vice President of Sales, met with the sales force, or rather was meeting with the sales force, going through the pipeline, and there were no deal delays because of the economic crisis. The District Court held that this statement could be downright false if the truth was that the company knew it was already being impacted by the credit crunch at the time of the denial. There are two things wrong with the Court's analysis and conclusion that this statement was not false. First, that is precisely what is alleged in the complaint, that the company did already know that it was being impacted at the time of the denial. The complaint names three witnesses, Mr. Sudarsanam, Mr. Pace, and Ms. Johnson, who said that the company was being impacted at that time. Mr. Pace said hospitals were reporting back that they didn't have $2 million to purchase a da Vinci system and instruments. Now, if a jury were to find these witnesses to be telling the truth, as the Court must assume on a motion to dismiss, then defendants violated the securities laws by misleading investors. I think you're missing a link, so help me out. We've got the statements, the delays in the line of credit, which are characterized under the potential falsity, but those are basically reliant, as I understand it, on your core operations theory, because you've got ---- I don't think they're solely reliant on a core operations theory. Tell me why not when you have these low-level, you know, like Mr. Pace, who was there at the company three months. What is there evidence to say that someone beyond Mr. Pace, for example, knew about that information? Right. Well, there's been some dispute throughout the hearings about how long these witnesses were at the company. Okay. Well, let's just ---- Right. And most were there for the entire class period. How long was Mr. Pace there, according to the evidence? I'm not sure. There was one witness who was only there for a few weeks at the time. I think that might be Mr. Pace. Okay. So you've got Mr. Pace, Ms. Johnson, and Mr. Sudarsanam? Sudarsanam. Sudarsanam. Okay. Thank you. Right. And I think the important thing, and the link that you're asking for, is how did these three witnesses purport to know that the company was already being impacted? And their testimony or the allegations are that they relied on very specific reports, including a sales pipeline report, in their ordinary course of business. These are reports that were delivered to them and that they relied on to perform their functions. And I think the link is created by the six witnesses who said these same reports were used by the executive defendants and relied on by the executive defendants. And they're looking at the same exact information that these three witnesses are looking at. And I think the Seventh Circuit's decision in Tell-Labs 2, when it came back down from the Supreme Court, says that the fact that different levels of employees from different areas of the company and different geographic regions supports that this information was readily available throughout the company. And the allegations are that this information was pervasive throughout the company through seven different kinds of specific reports in real time and actually used by the defendants. I think some of the witnesses say, well, I know some of the witnesses say that these reports were used in weekly sales meetings, relied on by the executive defendants, and there was a comparison between sales that were actually made and quotas and directives that were established by the executive defendants. So I think that link, if you look at South Ferry and then the two cases addressing CNTRAFTER, Verifone, and most recently in Reese vs. Malone, they have a more detailed explanation of the core operations theory saying that the access to this information, with this information being readily available and in Malone actually spoken about by the individual defendants, shows that they had access and knowledge of the information. Reese vs. Malone was submitted a month or two ago and was resubmitted under TWA. But I guess one of the questions comes up in trying to unscramble this massive complaint, and the information is the, is it enough to say, well, this is available and so they must have known? I mean, there's a gap between blind eye and then general attribution, which you're trying to make here. What does the law say about that? Well, I think if you look at Lipton, which is relied on by the district court, and you look at Oracle, that those are the two cases that tell you where the law is, and then that's supplemented by Reese vs. Malone, which cites the Oracle and South Ferry. I think in Lipton, where you had a situation where the plaintiffs argued this information was, there was information about demand available, and product demand available on a third-party site, and you had your own sales information, and you could have taken this information and extrapolated or manipulated it to come up with a report that would have showed you X, Y, or Z, but that's not enough. But where you have witnesses that are saying these were actual reports that were used by the individual defendants on a weekly basis, and these reports exist and can be sought through a simple discovery request to see what these reports verify, what these witnesses say or don't, that that's a lot different than Lipton. And it's more towards Oracle, where Oracle, the court found that defendants had real-time access to sales at any minute, which is the same capabilities that are alleged in the system used by Intuitive. The only difference in Oracle is that you were talking about a very small segment of Oracle's business at a very large company. Here, you're talking about one product, and you have 261 sales employees to sell only 241 machines in the year before the class period. And the only business that the company is doing is selling these machines and then the instruments that go along with it. And you have allegations that the individual defendants were using the same information, at least on a weekly basis, even though it was available real-time, and that it was discussed in weekly meetings. And if you look at Reese Malone, where one of the defendants was talking about data, just like the defendants here talked about sales placements and system placements and procedures, that that was an implication, if you were talking about it, that you knew or should have known about the information underlying what you were talking about. At least you would be reckless to not look at the complete information to go and talk about partial. Is there any admission by the defendants that we are looking to in this case? Yes. Particularly with respect to this core operations theory? There are two types of admissions. The first is starting with the January 31st statement, which I read to you that the district court said could very well be false. You have defendants at January 31st. That's where they ask about it, are there delays in lines of credit, and they say no. Yes. Okay. But that's maybe not quite my statement. Mine is that, are there admissions by the defendants which show that they knew that what they were saying was false? In a lot of these cases, there's the book allegations, and they even use those words, or the defendants say something that would lead you to say no. Well, how could they say no when they said yes yesterday? So I'm asking, is there anything like that with respect to these defendants and these statements that were characterized as false? Is there an admission that the company was being impacted by it? No. Is there an admission by these defendants? Is there any evidence out of the mouths of these defendants specifically showing that they knew something was false? Well, there's a curated disclosure on January 7th, 2009, where they say that the company was indeed impacted by the economic crisis. With regards to system placements and market saturation, there's an admission in April during the analyst call where they say, yes, we had lower first-time customers than we had in the past, and we made up for that with repeat purchasers. Is that false? I believe that it is, and I think if you look to the analyst reports that come out after these partial curated disclosures, you will say that what the statements were said previously in close temporal proximity were false, that they proved not to be true. When the defendants made the misleading statements, the analyst reacted to that in their reports, and the stock price reacted to that by going up, and when the truth was revealed a short time after, the analyst said this was not the case, this was not true, and the stock price came down. I think if you look at Resource Malone, they make a distinction between cases where you're relying on accountants and bookkeeping, where individual defendants are more removed from the actual numbers and the reports of what came out, and say that that's a little bit different than when you're talking about just a sales and product demand and the main source of the company's revenue. What, in your view, is the actionable misstatement? I think there's three categories of actual misstatements, but I think the strongest category is with the impact of the economic impact at all. They were providing certainty that there was no impact, when there was a clear, obvious risk that there could be an impact, and in fact was. And if you look at South Ferry and Verifone and Resource Malone, all these cases decided after tell labs, they clearly say, they say that it is wrong to demand actual numbers and reports with, like, smoking gun evidence that tell labs disavow. They said that that standard, which was set in Silicon Graphics and Rite Aid, was too harsh. And I think you see a line of cases in the Ninth Circuit with the ones I just mentioned, and also the Third Circuit in the AVEA case and the Sixth Circuit, Frank v. Danacor, which is cited by a lot of Ninth Circuit cases, were saying where if you are creating the impression that you — if analysts are repeatedly asking you a question, and you create the impression that you have looked and have information and answer that there is no risk, when in fact you haven't looked or there is risk, that you are misleading investors. There's a quote from Resource Malone where it says, defendants misled investors because her statements lent an element of a certainty to a situation previously indicating risk, which is inherently misleading. I think that's consistent with the Third Circuit and the Sixth Circuit. I think I understand your point. Excuse me? I understand your point. Okay. Do you want to reserve any time for rebuttal? I do. I'll reserve the remaining time. Thank you. Good morning, Your Honors. Michael Celio of Hecker and Van Nest for Appellees and Defendants Intuitive Surgical. May it please the Court. I'd like to begin with a question that Your Honor asked. Is there any admission of falsity? And the answer is no. There was no admission of falsity here. As this Court is well aware, in many of the cases that we see in this field, there's been a massive restatement or the company is a smoking hole in the ground or something terrible has happened. That's not this case. In fact, in this case, stock is at about $435 a share now. It's gone way up. So if they had stuck with it, they would have done very well. In fact, in this case, most of the projections we're talking about came true or very close to true. Now, I don't offer that as an independent reason for the Court. There's no doctrine that says if you get it right, that's everything. If you get lucky later, you. Right. That's not the law. And I don't mean to suggest that it is. But when we're talking about falsity, which is obviously one of the elements, and we're talking about Scienter, it's a really important factor to look at because during this period of incredible economic turmoil, we're talking about a company that made predictions that it would grow by 45 percent in its system sales, and it ended up growing by, I believe, 41 percent, 40 percent. So it's a company that grew a great deal. It just didn't grow by quite as much as it thought it would. Could you direct your attention to the statements that I think the district court characterized as falsity statements? And he actually went right to that before, and I think he was referencing by implication C-5 and D-7, which are basically statements where the company says, well, this credit crunch has not had an impact, and particularly where there are delays in the lines of credit, no. Would you address those? Because he says, you know, those turn out to be false if you look at these underlings like Mr. Pace and Ms. Johnson and others in terms of what they said. So first, Your Honor, specificity and particularity is an element of the law here. So let's talk about when that statement was made and what was said in that conference call. So C-5 is made on April 17th. On April 17th, we predicted that system revenue growth would increase by 33 to 35 percent. At the end, it increased by 40 percent. So we beat that prediction. So far from being false, even with the benefit of hindsight, that statement was true. I don't see how you can get to the conclusion that when we're saying we're going to grow by 33 percent and then we grow by 40 percent that there's embedded in that same time frame had to do with not hearing about the hospitals. And C-5, Your Honor, is. Maybe I might have written it down wrong. If you'd like me to wait, I'll do so. Okay. C-5. No, we're not hearing anything there. I know over the quarter we've had various questions as to whether or not there's been an impact due to credit issues. And as far as we can tell, there haven't been any to our system sales. Again, this is made in support of a prediction. We don't think there's any impact. We're sticking with our prediction, 33 percent growth. At the end of the class period, they hit 40 percent growth. So let's talk about what TELABS says about that. TELABS and, Your Honor's decision in Verifone says you look at the inferences on both sides. It's an inherently comparative inquiry. This is what Justice Ginsburg tells us. And Verifone follows that. What inference should this Court draw from a statement? We're talking about Scienter. What inference should we draw from a statement made in support of a prediction of 33 percent growth that goes to 40 percent growth? I think that the inference is that we got it right. I think that that's the only fair inference that you can draw from that. Your Honor also asked, I believe, about D-7. Did I hear you correctly? Right. About whether this credit crunch had had a change in either buying or selling. Right. And D-7 says certainly not. We have not seen any impact on, let's say, credit crunch on the buying patterns of our customers. We get that question often. We've had it for the past six months. And the answer is still the same. We haven't seen any impact on the buying patterns. Okay. This statement is made July 22nd, 2008. And by the way, just for the Court's reference, the economic crisis hits, you were all there, October, about October 15th, October 18th of that year. That's when Lehman Brothers fails and the market crashes. So in July 22nd, we have this statement. On July 22nd, we say system revenue growth will be 38 to 40 percent growth. Respectfully, Your Honor, that's not fraud. Again, under tele-abs, what inferences do we draw? What are the comparative inferences we draw on the basis of that fact? Respectfully to Mr. Pace, to Mr. Sudarsanam, to Ms. Johnson, their subjective impressions in their small little worlds that sales might be slowing, while we take them at face value, as we're required to at this stage of the proceeding, doesn't actually weigh very heavily on the comparative tele-abs scale. Because what tele-abs says is, look at the inferences you draw from both. We have our executive team saying, we haven't seen anything yet. What we report at the end of the year is, at that point, we hadn't seen anything. I guess what this comes down to is, this area of the law requires particularity. When did Mr. Pace see this slowdown? When did Mr. Sudarsanam see this? When did Ms. Johnson see this? When were these reports written? What did those reports say? I think that the question about the particularity in those reports, there's a very particular passage in the Oracle case, page 1231 of that case, that compares Lipton and Oracle to each other. And what the Oracle court says is hard data. That's what it looks at. And I would really refer the court to that hard data. Maybe I didn't press precisely enough, and I could go back and look in the complaint. But his argument was that these reports, internal company reports on sales data, that there's two parts to it. One, that there's real-time access, and they're pervasive throughout. And that those reports also tell you that there is actually a slowdown in sales. Now, is that what the reports say? And do we need to credit the fact that they're readily available and the nature of this company as to executive access? An excellent question, Your Honor. I'm glad you asked it. The complaint is silent on that. I know the answer. The reports don't say that. But for your purposes, the answer is the complaint doesn't say. And there's no allegation. And that's fatal. In this context, you don't just get to say, hey, there are reports, and they must have said something because we know with the benefit of hindsight that we had a quarter where sales didn't quite meet our expectations. You don't get to do that. You need to say, on this date, the report said X. Now, there's a dispute in the law about just how specific that has to be. But that dispute has no purchase here because there's nothing in the reports except the idea that it must have said this, which is why they go to South Ferry and the core operations inference here, because that's the only way to save it. That's always the argument of last resort because South Ferry allows you in some circumstances to get Scienter by saying it's absolutely obvious. I think it's reasonably clear that this is not a case like Burson, which is sort of the key core operations case. In Burson, 80% of the company's revenue was about to go away, and yet they made statements that kept that revenue in the backlog. This is a case where we're talking about the difference, again, between 40% growth and 43% growth, an excellent result in a very difficult year, as opposed to a situation where a company is about to fail completely. So you're saying that even if there was access, if we accept it's true that there's access in the nature of the company with this primarily one product, that there's, even if they had access to these sales reports and these internal reports, we don't have in the complaint the allegations or the information in the reports that they were supposedly imputed to the executives? Right. Access to what is the question the court should say, should look at. You know, when we're talking about access, we're sort of in a separate prong of South Ferry. We're in a second prong where we're talking about access to data, and that's what I was talking about with the Oracle case. And the question there is, again, access to what? I'd also like to maybe slow the rush on this idea that this is a single product company. I understand. It's not quite accurate. I understand there's some other products. Well, it's not even other products, Your Honor. It's just this is a device that does surgery, and so there is the machine, the device, the Da Vinci system, but it has arms that actually do the surgery. It's really quite an amazing thing. The surgeon sits in another room with 3D glasses and actually puts his hands in this and uses it. The arms that do the surgery are an FDA-regulated product. They can only be used a certain number of times. You wouldn't want your doctor using them again and again for obvious reasons. That's not quite half the business. People have referred to it as a razor blade and razor model. That's a little bit like saying tin cans and iPhones are the same, but it does for rough justice. So, again, we're talking about one portion of this company's business, the machines, admittedly a big piece of it. And, I mean, I think it would be unfair to not characterize it as the significant portion of their business, which is the machines and also the replacement and the follow-on parts. Well, but all of the allegations that are being made are just to the machines. The system. The system. Mr. Pace is a gentleman who, for the short time he worked for the company, went out to hospitals in Florida and tried to convince them to purchase these machines, which are quite expensive. Ms. Johnson, Shneika Johnson, was in the shipping department, and it sounds like, although it's a little hard to tell from the complaint, it sounds like we're talking about shipping machines. That is, I think it's fair to say, the primary focus of this complaint. I guess in the very brief time I have remaining, we focused exclusively on falsity and scienter. There is a preliminary question, and Judge Koh's opinion starts at a different place, because the question is falsity and scienter about what? There are a number of these statements that the safe harbor simply takes off the table. I recognize that Your Honor wrote the Kutera decision, so I hardly need to explain what it says, but you don't even get to scienter under subsection A of the safe harbor. You simply look and see if the statements are forward-looking, if they're identified as such, and if you've given meaningful cautionary language. That's not every statement in this case, but it is a significant chunk of them. I believe it is at least 12 of them. There are also eight more statements that are made at the very beginning of the class period in January in which the statements are simply a report of the prior year's sales. And Judge Koh said, I think appropriately, that there couldn't be an omissions case based on that, because under Brody and actually under Kutera as well. Is that the 2007 report allegation? Yeah, the 2007 10-K, which is issued in January of 2008. And so you're actually down to only a handful of statements by the time you actually get to scienter. What about, apart from ones that might have fallen in safe harbor as forward-looking, what about the statements that were characterized as puffery? Right. So those statements, I mean, we're in – I actually never thought I would in my career see a case where the phrase, we're reservedly optimistic, would be challenged as fraud. But that's one we've got here. It's a statement of corporate optimism. I think that's the heartland. Similarly, we were accused of fraud on the phrase, I wish we had a crystal ball. It's early. It's a challenging time, and we're going to work through it. I think those statements are in the heartland of what we've called puffery. But even if one takes it out of that particular designation, I think the falsity in scienter part of this case in the analysis still applies. I think Judge Koh wrote a very thoughtful, very detailed opinion that is very faithful to this Court's precedent. While it is a de novo review, I think that it is an excellent guide, and I believe it should be affirmed. If the Court has any other questions. Thank you. Thank you. May I just ask one question? I don't want to take your rebuttal time, but on the claim that these underlying reports to which the executives, by implication, had access, Mr. Cillia says the specifics of those reports and what they say so that you can benchmark whether or not there was fraud about them, that that's not in the complaint, that that's what's missing. And I would appreciate your comment on that. Right, Your Honor. I don't – the complaint does not allege direct evidence of what the reports say, which is what Silicon Graphics requires, and South Ferry says it's too harsh. But you are allowed circumstantial evidence to see if they're under Gebhardt, the Ninth Circuit decision. And what we have is what witnesses, named witnesses, are telling you those reports say. And if those witnesses are telling the truth, then it's a reliable source and it's not the same question if you have unnamed confidential witnesses where you can't see if these people are reliable. We have actually named people. You can measure the reliability of those witnesses. I think there's a circumstantial change there, a chain there as to what the reports say. I would like to make a point about system revenues. Mr. Cillia said the system revenues were met. They predicted 38 percent and they met 40 percent. You know, your voice drops and I miss you. I don't hear what you say. Sorry. System revenues. The company says we met system revenues, so that meant that all was fine. And I think there's a clear distinction here between system revenues and system placements. In fact, Item 303 requires that when you say you've met system revenues, you have to explain and have to have a discussion as to whether or not that's a result of increased prices or increased quantities. And here it was they said that it was due to shipments implying or saying increased quantities when really it was due to increased prices. And system placements is important because it is a razor, razor blade model where you cannot sell instruments and have recurring revenue if you don't have the systems in place in the first place. And I think the fact that the company met system revenues but fell short on system placements and the stock fell 70 percent, over 200 points, is indicative that analysts were paying more attention to placements and not revenues due to increased prices. And I think the analyst reports bear that out. The final clarification that I would like to make, unless you have questions, if you'll allow me to do it, is that these economy statements were made in the context of the auction rate securities market freezing in February or March of 2008. Bellwether, General Electric coming out and saying we've noticed a decline in system sales purchases because of hospital fundings in the entire market, in the entire industry. And a series of newspaper articles alleged in the complaint where they're saying hospitals are being impacted by this spending crisis. So you have the whole industry and Bellwethers and reporters and analysts saying that hospitals are being impacted and not buying machines. And then you have steadfast reassurances from defendants that while that might be true for everybody else, it's not true for us. But it was true. And it was only reported later because the company only reports their final sales at the end of the year, not in short. Thank you. Thank you. I'd like to thank both counsel for your argument and briefing. The case just argued, police retirement versus intuitive surgical is submitted.
judges: Farris, Tashima, McKeown